12WATKINS, Judge.
Appellant, Insulation Technologies, Inc. (ITI), challenges a decision by the Secretary of the Louisiana Department of Environmental Quality (DEQ) in which he upheld an adverse decision of an administrative law judge (ALJ) finding ITI in violation of several DEQ regulations and assessing a civil penalty.
The following background information was provided by the ALJ:
On March 1, 1993, the Department inspected an asbestos removal project being conducted by the Respondent in the boiler room of Earl K. Long Medical Center located in Baton Rouge, Louisiana. The Department alleges that the Respondent violated Air Quality Regulations during the asbestos removal project. Specifically, Penalty Notice AT-P-93-0016 cited the Respondent with removing “RACM” (Regulated Asbestos Containing Material) without wetting the materials, in violation of LAC 33:III.5151.F.3.c.; failing to seal the tops of glove bags to prevent the release of asbestos material to the outside air, in violation of LAC 33:III.5151.F.3.c.; failing to properly seal bags containing removed RACM to make them air tight, in violation of LAC 33:III.5151.J.1.a.iii.; failing to properly label the bags containing RACM with a generator label in violation of LAC 33:III.5151.J.1.a.v.; and for failing to give the Department notice of the completion of the project within twenty-four hours, in violation of LAC 33:III.5151.F.3.m. Each of the above allegations were also cited as a violation of Section 2057(A)(2) of the Act.
The Penalty Notice AT-P-93-0016 assessed a penalty in the amount of ten thousand dollars ($10,000.00) to the Respondent for the above listed violations. The Department asserts that the penalty amount was assessed in accordance with Section 2025(E) of the Act and is reasonable given the violations and factors considered.
*1345 The Respondent alleges that all RACM was removed properly and in accordance with the Department’s regulations. Respondent also alleges that all the material found in unsealed glove bags was trash and debris, therefore, the bags were not required to be sealed and the material was not required to be wet. Respondent further alleges that notice was given to the Department once it was determined that the project could not be completed.
Following a hearing, the ALJ made the following findings of fact:
1.
Respondent operates an asbestos abatement contracting service, headquartered in Harvey, Louisiana. Respondent was hired by Earl K. Long Hospital, located in Baton Rouge, Louisiana, to remove twenty feet of asbestos containing pipe insulation in the boiler room of the hospital, and three feet of asbestos containing pipe insulation in the labor and delivery room of the hospital.
2.
Prior to the start of the project at Earl K. Long Hospital, Respondent notified the Department of the removal by sending a Notification of Demolition and Renovation Report. In the report, Respondent listed as the site location “Boiler Room”, and described the | .^planned demolition or renovation work as “Removal of 20 In. ft. of asbestos-containing pipe covering.” In response to the question concerning the description of work practices and engineering controls to be used to prevent emissions of asbestos at the demolition and renovation site, the Respondent reported “Glove bag removal.” The labor and delivery room was not listed on the report.
3.
Respondent’s employees, Mr. Anthony Johnson and Mr. Dung-Pye, reported to Earl K. Long Hospital on March 1, 1993, at 7:30 a.m. to begin the removal project. Mr. Johnson was the supervisor of the project. Both he and Mr. Dung-Pye are certified by the Department to perform asbestos abatement.
4.
Upon closer inspection of the section of pipe insulation to be removed, Mr. Johnson discovered that the pipe was a “hot pipe”, or a steam pipe. A “hot pipe” is a pipe which hot water or steam is transported through.
5.
Mr. Johnson believed that a glove bag [A “glove bag” is defined in LAC 33:III.5151.B as a sealed compartment with attached inner gloves used for the handling of asbestos containing materials.] could not be secured and sealed to the hot pipe because once the insulation surrounding the hot pipe is removed, steam would form in the bag possibly causing the bag to melt or burst.
6.
Mr. Johnson secured a glove bag to surrounding pipes and placed it under the section of pipe insulation he was to remove. The bag was not sealed and the top of the bag was open to the outside air. The purpose of this “modified glove bag method” was to allow the asbestos pipe insulation to fall into the bag as Mr. Johnson stripped it from the pipe.
7.
Mr. Johnson wet the pipe insulation before stripping the material and allowing it to fall into the glove bag. Mr. Johnson then sealed this glove bag with duct tape.
8.
On March 1,1993, at approximately 9:30 a.m., Inspectors Terry Pettigrew and Amy Mack of the Department’s Air Quality Division inspected the boiler room at Earl K. *1346 Long Hospital. As the inspectors entered the work area in the boiler room, they noticed that the workers were not wearing white asbestos removal suits and one worker did not have a personal respirator.
9.
Inspector Pettigrew witnessed one of Respondent’s employees on the mezzanine passing an open glove bag to the other employee below. The glove bag contained a RACM warning label and was not sealed. There was material inside the glove bag.
10.
The inspectors immediately shut the job down.
Jill-
One of the Respondent’s employees told Inspector Pettigrew that they did not have all of the proper equipment.
12.
Inspector Pettigrew saw four to five glove bags on the mezzanine of the boiler room. These glove bags had an asbestos warning label on them and were not sealed. The material inside the bags appeared dry, and showed no visible signs of water droplets.
13.
In addition, Inspector Pettigrew saw an open, glove bag hanging from a pipe above the mezzanine. This bag contained material, which appeared to the Inspector to be RACM.
14.
Inspector Pettigrew found one glove bag on the floor of the boiler room which was sealed with duct tape. The glove bag had an asbestos warning label on it and contained material. There were no visible water droplets in the bag.
15.
Inspector Pettigrew saw a few other glove bags on the floor of the boiler room which were not sealed, contained material, and were labeled as RACM. No water droplets were seen inside the bags.
16.
The DEQ inspectors did not witness the workers removing RACM.
17.
The inspectors did not take samples of the materials in the glove bags nor did they touch the materials inside the bags. Air samples were not taken by the Department.
18.
There was no visible emission of asbestos fibers.
19.
Inspector Pettigrew told the workers that they could not continue the abatement work until they had the proper equipment, including disposal bags and white asbestos removal suits.
20.
Mr. Johnson obtained disposal bags and white asbestos removal suits from a local supply company and completed the abatement in the boiler room on March 1, 1993.
21.
The abatement in the labor and delivery room could not be started on March 1, 1993, because the room was being used.
22.
On May 14, 1993, the Department sent Respondent a Notice of Violation letter concerning violations which were allegedly *1347 observed during the March 1,1993, inspection at Earl K. Long Hospital.
23.
On June 11, 1993, the Department held an enforcement conference concerning the alleged violations. Mr. Gautreaux, President of Insulation | r,Technologies was present at this meeting. He admitted that Mr. Johnson had made some bad decisions.
24.
In a written response to the enforcement conference, dated June 11, 1993, Respondent stated that Mr. Johnson had admitted to being in violation of various Air Quality Regulations.
25.
On July 13, 1993, Earl K. Long Hospital cancelled the contract with the Respondent for the remaining abatement of three feet of pipe insulation in the labor and delivery room.
26.
The Department received a notice of completion of the abatement activity at Earl K. Long Hospital from the Respondent on July 27,1993.
The ALJ also reached the following conclusions of law:
1. ITI violated LAC 33:III.5151.F.3.e. by failing to seal the tops of the glove bags to prevent the release of asbestos containing material to the outside air.
2. ITI violated LAC 33.III.5151.F.3.C. in fading to wet the RACM adequately.
3. ITI violated LAC 33.III.5151.F.3.m. by failing to provide DEQ with notice of completion of the project within 24 hours.
4. The above violations resulted in a violation of LSA-R.S. 30:2057(A)(2), which states that no person shall violate any rule or regulation adopted by the secretary under the Louisiana Air Control Law.
5. ITI did not violate LAC 33:111.5151.-J.l.a.iii.
6. Because DEQ waived the alleged violation of LAC 33:III.5151.J.l.a.v., it was unnecessary for the ALJ to reach a conclusion concerning same.
The ALJ also concluded that a civil penalty in the amount of $4,500.00 was appropriate and reasonable and assessed that reduced penalty.
STANDARD OF REVIEW
Judicial review of a decision of an administrative governmental agency is a limited review. The Louisiana Administrative Procedure Act, LSA-R.S. 49.964 G, provides that the court may reverse the decision if substantial rights of the appellant were prejudiced because the administrative findings, inferences, conclusions, or decision were affected by an error of law, were arbitrary or capricious or characterized by an abuse of discretion, or were manifestly erroneous. The manifest error standard of review is used for court review of fact-finding by Lan agency. In the Matter of Sixty Acres, Inc., 546 So.2d 575 (La.App. 1st Cir.1989). However, conclusions and exercises of agency discretion are subject to the arbitrariness test upon review. Bizette v. State, Dept. of Public Safety, 583 So.2d 875 (La.App. 1st Cir.1991). Thus, judicial review is a multifaceted function involving several categories: factual review, procedural review, statutory or constitutional review, and substantive review. See Save Ourselves, Inc. v. Louisiana Environmental Control Commission,. 452 So.2d 1152 (La.1984).
Our multifaceted review of the record in the instant case reveals corresponding multifaceted error by the ALJ: there is legal error in the identification of a so-called legal presumption, there is an abuse of discretion in the application of the presumption, which in turn led to manifest error in some of the *1348 fact-finding; and, there is an erroneous inconsistency between the findings of fact and the conclusions of law.
LEGAL PRESUMPTION
When a person invokes the right to a hearing to review the assessment of a penalty by an agency for violations of regulations, it is incumbent on the agency to prove by competent evidence the facts upon which the assessment is based. Compare Bizette v. State Dept. of Public Safety, 583 So.2d at 878. One of DEQ’s burdens in the instant case was to prove that ITI failed to seal the tops of the glove bags to prevent the release of the RACM into the outside air. Because the open bags could have released RACM into the air only if they contained RACM, a core element of DEQ’s ease was proof that the bags the DEQ inspectors observed at the site contained RACM.
DEQ presented no physical evidence of the contents of the bags. The DEQ inspectors admitted they procured no samples of the contents, performed no tests on the contents, and did not touch the open bags or open the one sealed bag. Instead, for the purpose of the allegations made in their report, the DEQ inspectors relied solely on a presumption that the glove bags contained RACM. Likewise, in presenting its case at the hearing, DEQ relied solely on the same presumption. The rationale given for reliance on the presumption was that this inspection was of an asbestos removal project site that DEQ had notice of. One of the two DEQ inspectors who visited the site admitted at the hearing that the presumption is relied upon only when they are inspecting a site pursuant to an advance notice; however, when they are inspecting a site pursuant to a complaint about an “un-noticed” project, samples of the ^materials are obtained for testing and for possible use as proof if the tests are positive for RACM. This testimony belies the conclusion by the ALJ that requiring that the inspectors procure samples for testing is too dangerous and too costly.
The ALJ embraced the presumption without reservation. She stated:
The Department has determined that any material found in a bag with an asbestos warning label is presumed to be RACM. This presumption is designed to protect the public from unnecessary risk of exposure to RACM. Without this presumption, the inspectors would have to open the bags and touch the material or test it to determine its condition. Asbestos is a hazardous air pollutant listed under the Clean Air Act, and such a procedure would expose the inspectors to unnecessary risks. The presumption that any material found in a bag with an asbestos warning label will be treated as if it were RACM is reasonably related to the purpose of protection of the public welfare and environment.
A presumption is defined as a consequence that the law or the court attaches to a known fact for the purpose of establishing the existence of another and unknowable fact. The known facts that lead to the presumption in this case are: that the Respondent informed the Department that an asbestos removal project was to take place at that time and at that site; there was in fact an asbestos removal project in progress at the time of the inspection; and finally, the glove bags had a clear asbestos warning label that was easily seen by the inspectors. The presumed fact is that all material in a glove bag with an asbestos warning label is RACM. These facts taken as [a] whole indicate that there exists a sound connection between the known facts and the presumed fact in this case.
* * * * ⅜ *
Therefore, whatever was in the glove bags at the site is presumed to be asbestos, testing is not required, and the Department may require that the bags be handled in accordance with the regulations governing asbestos removal. [Footnotes omitted.]
Additionally, in response to ITI’s assertion that the material inside the open glove bags was only trash and debris that had been *1349 collected from the boiler room, and not RACM, the ALJ acknowledged that had that material been placed in generic trash or garbage bags, DEQ could not have required that the bags be sealed or that the contents be wet down.
■ We conclude that the ALJ erroneously allowed DEQ to satisfy its burden of proof by applying the presumption relied upon by DEQ as a legal presumption, which it'is not. The Louisiana Civil Code provides the- definition of a presumption that was quoted by the ALJ. See LSA-C.C. art. 1849. The code further provides that a party whose interest is favored by a presumption established by law need not offer other proof, LSA-C.C. art. 1850, but that a presumption not established by law is left to the discretion of the court, LSA-C.C. art. 1852. 18The source of Article 1852 was Article 2288 of 1870 which specifically provided that the judge, in exercising his discretion, ought to admit only presumptions that are “weighty, precise and consistent.” That provision has been interpreted to mean that the facts, such as actions or inaction, from which the inference is to be made must afford convincing, and even conclusive, evidence of the presumed fact. See Glazer v. Abroms, 202 So.2d 290 (La.App. 4th Cir.), writ refused, 251 La. 230, 203 So.2d 559 (1967), (in absence of legal presumption, court was unable to presume acceptance of obligation from defendant’s conduct); Bailey v. R.E. Heidt Construction Co., Inc., 205 So.2d 503 (La.App. 3d Cir.1967), (in light of contrary evidence, the court rejected presumption that a contract should be inferred from the party’s silence and inaction); Lowy v. Bulliard, 17 So.2d 855 (La.App. 1st Cir.1944) (this court held that defendant’s letters, introduced into evidence by plaintiff, were convincing evidence of his assent to contract of employment).
In addition to falling short of the evidentiary requirements of the Louisiana Civil Code and the jurisprudence, the presumption applied by the ALJ does not even satisfy the requirements of the federal cases that the ALJ cited. For example, a fact is presumed when, given the known fact, acceptance of the opposite of the presumed fact would “strain credulity.” Holland Livestock Ranch v. United States, 655 F.2d 1002 (9th Cir.1981).[2] In the instant case, it strains credulity to presume that marked bags always will be reserved for RACM and never will be used as containers for other material.
Without the presumption that the open glove bags contained RACM, there is no support in the record that ITI violated LAC 33:III.5151.F.3.c. by failing to seal the bags to prevent the release of asbestos into the air. Accordingly, that portion of the ALJ’s decision shall be reversed.
Next, we turn our attention to the conclusion that ITI failed to wet the RACM adequately, a conclusion that focuses on the one bag sealed with duct tape that admittedly contained wetted RACM. In examining the ALJ’s remarks on this subject, we note that, without mentioning a presumption, the ALJ applied another one to decide the issue. This was reversible error.
|9LAC 33:III.52151F.3.c. provides in pertinent part:
When RACM is stripped from a facility component while it remains in place in the facility, adequately wet the RACM prior to and during the stripping operation.
There is no evidence that the ITI workers did not comply with the above regulation by wetting the RACM prior to and during the stripping operation. Indeed, the ALJ found for a fact that Mr. Johnson wet the pipe insulation before stripping the material and allowing it to fall into the glove bag, which he then sealed.
However, the ALJ concluded the wetting was not “adequate.” The ALJ cited the following definition of “adequately wet” found in LAC 33:III.5151.B:
[sjufficiently mix or penetrate with liquid to prevent the release of particles. If visi *1350 ble emissions are observed coming from asbestos containing material, then that material has not been adequately wetted. However, the absence of visible emissions is not sufficient evidence of being adequately wet. Once contained, water droplets formed inside disposal containers will be sufficient evidence of being adequately wet.
Noting the testimony of both inspectors as to the lack of visible water droplets, the ALJ concluded the material was not ‘adequately wet’ and ITI was in violation of the regulation because “no water droplets were observed inside any of the glove bags labeled RACM, including the one sealed with duct tape.” [Emphasis supplied.] Although the appellant was not entitled to the favorable presumption established by the regulations— that water droplets inside the container are sufficient proof of adequate wetness — appellant should not have been subjected to the opposite, unfavorable presumption. The regulation does not say that the absence of water droplets inside the container is sufficient proof of inadequate wetness; yet, that is exactly the way the ALJ read the regulation. Because violations of DEQ regulations can result in the assessment of a civil penalty, as in the instant ease, the regulations are penal in nature and must be strictly construed. See In re Woodrow Wilson Const. Co., Inc., 563 So.2d 385 (La.App. 1st Cir.1990), for an example of a finding by this court of an error of law when the hearing officer misread the regulation and applied the wrong notice requirement.
Because the ALJ erroneously presumed a fact that DEQ did not prove, we reverse the conclusion that ITI violated LAC 33.-III.5151.F.3.C. by failing to have the RACM adequately wet.
I ^REQUIRED NOTICE
Finally, we consider whether ITI violated LAC 33.III.5151.F.3.m. by failing to provide DEQ with notice of the completion of the project within 24 hours. Although ITI did not provide DEQ with notice of the conclusion of the cleanup until some time after the day of the DEQ inspection, the facts of the instant ease, including the action taken by DEQ, militate against finding fault on the part of ITI for the delay.
The record establishes that the renovation activity in the boiler room of the hospital had not ended and that the work area had not been cleared on the day of the inspection by DEQ. Instead, the DEQ inspectors shut down the job on the grounds of observed violations, and the shut-down occurred before the work was completed by ITI. Additionally, the ITI employees were to return to the hospital for further work in another area[3] under the abatement contract. Several weeks passed before ITI learned that the hospital was not going to allow any further. abatement work and, therefore, had canceled the remainder of the contract work. Upon receiving notification from the hospital, ITI notified DEQ of the completed work.
Considering the relevant facts of this aborted asbestos removal project, we find that even if ITI technically failed to give DEQ timely notice, such failure was insignificant and cannot support a finding of violation and assessment of penalty. Accordingly, we reverse this portion of the ALJ’s decision.
Having reversed the ALJ’s findings of the underlying violations, we hold that the conclusion that ITI violated the Louisiana Air Control Law is not supported by the record. Accordingly, we reverse the entire decision of the DEQ Secretary, including the assessment of a penalty, and we dismiss the DEQ’s allegations against ITI of regulations violations. We cast DEQ for all costs of this appeal, in the amount of $246.00.
REVERSED.

. The labor relations cases cited by the ALJ are factually distinguishable from the instant case and do not support application of the presumption by the ALJ.

. We find it immaterial that the notice of the intended project listed only the boiler room and not the other location at the hospital; both locations were merely parts of the same project site.